WILLIAM DEAN MYERS *et al.*, Plaintiffs-Appellees, *v.* HOWARD ARNOLD *et al.*, Defendants.—(HOWARD ARNOLD CONSTRUCTION, INC., Defendant-Appellant.)

Fourth District   No. 15742

Opinion filed April 11, 1980.

Ronald N. Hanley, of Hanley, Traub & Hanley, of Fairbury, for appellant.

G. Michael Prall, of Zanoni, Flynn & Prall, of Bloomington, for appellees.

Mr. PRESIDING JUSTICE MILLS delivered the opinion of the court:

This case involves 60-80 truckloads of concrete—all dumped on plaintiffs' property.

A jury found such dumping wrongful and gave plaintiffs a verdict of $12,000.

Defendant appeals, claiming: (1) The trial court erred when it allowed plaintiffs to recover the cost of repair rather than the diminution in market value; (2) the court erred in excluding certain evidence; and (3) the jury's decision is against the manifest weight of the evidence.

We affirm.

## FACTS

In 1972 or 1973, the plaintiffs purchased a 20-acre tract of land near Leroy, Illinois. In July of 1974, they began constructing a residence on the western portion of this land, and at the time of trial they were residing at this location. The land is divided diagonally by a creek, and when the land was originally purchased, the plaintiffs intended to construct their present residence, sell it, and then build another residence on the eastern portion of the property.

The creek which ran through the plaintiffs' property created an erosion problem and it was thought that broken concrete could be used to correct this problem. In the fall of 1974, the plaintiffs discovered that the defendant was engaged in a road repair and construction project on U. S. Route 16 near Leroy. Plaintiff, Mrs. Anna Myers, contacted Howard Arnold, president of the defendant, about getting some concrete fill and he told her to see his job-site supervisor so that he could inspect the premises where the concrete was to be placed.

In October 1974, Mrs. Myers, along with her father, went to the construction site to talk to the job-site supervisor, Stanley Wojciechowski. At trial, Mrs. Myers testified that she asked the supervisor about getting "a couple of loads of concrete." Following this request, the supervisor, Mrs. Myers, and her father went to the plaintiffs' property, and Mrs. Myers indicated the spot where the concrete should be dumped. According to Mrs. Myers' testimony, she told the supervisor that she wanted a couple of loads of concrete and that she preferred that it not include rubble or dirt.

The day after Mrs. Myers talked with the supervisor, she received a call at her home in Bloomington where she then resided. Her father informed her that quite a bit of concrete had been delivered and he suggested she come and inspect it. When she arrived at the property, she discovered that the amount of concrete delivered far exceeded the amount desired. The concrete contained reinforcing rods, was stacked 8 feet high in some places, and covered an area approximately 50 x 150 feet. It had been placed where the plaintiffs intended to build the second house. Mrs. Myers immediately contacted Howard Arnold, but he would not agree to remove the concrete.

Mrs. Myers' father, Ance Huff, testified that when he was at the construction site with his daughter, she told the supervisor she wanted

4

two loads of concrete. Mr. Huff also stated that the supervisor said they could have all the concrete they wanted.

On the issue of damages, the plaintiffs presented the testimony of John Nord, who is self-employed in the refuse removal and demolition business. He detailed the various costs for removing the concrete and estimated that the total expense would be $18,200. However, he admitted that if he were able to find area farmers who wanted the material for erosion control, the cost would be decreased because the material would not have to be hauled as far as he had planned when estimating the cost of removal.

Prior to resting their case, plaintiffs called Howard Arnold, president of defendant company, pursuant to section 60, and he testified that the contract price for the Leroy construction project was approximately $2,400,000.

Defendant presented the testimony of Stanley Wojciechowski. At the time of trial, he was employed as a sales representative for a heavy machinery distributor. In this position he never sold equipment to the defendant nor did he intend to because defendant was in the process of going out of business. Wojciechowski had held the sales representative position for two years, but prior to that time he was employed by the defendant where he was the supervisor of the Leroy construction project.

Mr. Wojciechowski testified that when Mrs. Myers requested the concrete, she indicated that she wanted concrete from an area covering both sides of the road and at least several thousand feet long. When he told her that this was a large amount of material, she responded that she had a place for it. He denied that she had said she only wanted two loads. He also testified 60 to 70 loads of concrete were then placed on plaintiffs' property and that Howard Arnold had previously told him to find out what Mrs. Myers wanted and give her the material.

The concrete from the Leroy construction project had been dumped at several locations including a cemetery about 8 miles from the project. Plaintiffs' property was only a mile or a mile and one-half from the construction project, and defendant saved about $490 by dumping the concrete on the land belonging to plaintiffs.

Defense counsel asked Mr. Wojciechowski if he would have delivered the concrete to the Myers property if they had wanted only two loads. Plaintiffs' objection to this question was sustained. The court also sustained an objection to a question concerning why the defendant obtained releases from property owners after material is dumped on their land. Similarly, defendant was prevented from presenting evidence as to whether the State of Illinois required releases before payment. However, Mr. Wojciechowski did admit that he did not attempt to get a release from the plaintiffs.

In an offer of proof, the defendant presented evidence that the State retained some of the money due on a construction project until it receives releases from private property owners where material is dumped. Other evidence presented during the offer showed that if plaintiffs had asked for only two loads, they would probably have been told to meet the truck driver and show him where to place the broken concrete. Mr. Wojciechowski would not have had time to go to plaintiffs' property under those circumstances.

At the close of the first day of trial, defendant moved for a directed verdict, arguing that the plaintiffs had failed to present sufficient evidence on the issue of damages. The court asked for citations to authority on the issue of whether the plaintiffs had to show the diminution in market value as well as the cost of repair. At the beginning of the second day of trial, the defendant's motion was denied because the trial court concluded that the proper measure of damages was the cost of repair.

Defendant's president, Howard Arnold, testified that when Mrs. Myers contacted him in the fall of 1974, she said that she could use a "lot" of concrete. He also testified that she said she could use every bit of concrete that he had, and he responded that this was a great deal of concrete. According to Mr. Arnold, Mrs. Myers persisted in her statement, and he told her to contact the job-site supervisor. Mr. Arnold then contacted the supervisor and told him that Mrs. Myers could have the concrete. After the concrete was dumped, Mrs. Myers contacted Mr. Arnold again and her attitude was completely different. She did not want any concrete.

Finally, Mr. Arnold testified that when this 2.4 million dollar construction project was bid, the intent was to dump the concrete at a cemetery and this cost was figured into the job.

By way of an offer of proof, the defendant presented the testimony of a real estate appraiser who had examined plaintiffs' property four days before trial. The appraiser testified that on the date of trial the fair market value of the plaintiffs' property was $750 per acre. This value, however, was based only on the land and did not include plaintiffs' house. In 1974, plaintiffs' property would have been worth $650 per acre. The appraiser also testified that the fact that one-half acre of plaintiffs' property was covered with concrete would have no great effect on its value for resale purposes.

At the conference on instructions, the court—over the defendant's objection—ruled that it would give the plaintiffs' instruction concerning the measure of damages. This instruction measures damages by the reasonable expense of removing the concrete. The court therefore rejected defendant's tendered instruction which stated that the measure of damages was "the lesser of the reasonable expense of necessary repairs

to the property which was damaged or the difference between the fair market value of the property immediately before the occurrence plus [*sic*] its fair market value immediately after the occurrence."

I

The defendant argues that the trial court erred in failing to give its tendered instruction on the issue of damages. Defendant therefore claims that this case must be remanded because the verdict of $12,000 (which represents the cost of repair) far exceeds the diminution in the market value of the plaintiffs' property.

■■ Initially, we note that defendant's tendered instruction did not state the rule on which the defendant relies. The tendered instruction would have informed the jury that the measure of damages was the lesser of the reasonable expense of repair or the difference in the fair market value of the property before the occurrence "plus" its fair market value after the occurrence. The word "plus" should not appear in this instruction. Illinois Pattern Jury Instruction, Civil, No. 30.11 (2d ed. 1971), uses the word "and" where defendant submitted the word "plus." We are confident defendant would not have the jury fix damages in the manner provided by the tendered instruction.

Although the defendant failed in other respects, we agree that the trial judge's statements clearly indicate that opinion evidence on the diminution in the market value and an instruction appropriately worded to express defendant's theory of the case would have been rejected. This is apparent from the court's ruling that the measure of damages in this case was to be determined by ascertaining the amount necessary to restore the property to its previous condition. Whether that ruling was correct is the primary question raised in this appeal.

Defendant relies on the rule generally stated that tort damages for an injury to real property are to be measured by the difference between the market value of the property before the injury and its value after the injury. (*Stirs, Inc. v. City of Chicago* (1974), 24 Ill. App. 3d 118, 320 N.E.2d 216; *First National Bank v. Amco Engineering* (1975), 32 Ill. App. 3d 451, 335 N.E.2d 591.) Illinois cases have not always clearly distinguished between situations where the injury was to the land and those where the injury was to an object having a value ascertainable without reference to the land. In fact, the cases upon which defendant relies are examples of situations where the injury was not to the land itself but to a building in *Stirs* and to certain trees in *First National Bank.* Apparently the courts of this State have allowed a plaintiff to recover the amount necessary to repair the injured realty (*Kremeyer v. Shumate* (1959), 20 Ill. App. 2d 542, 156 N.E.2d 271), but have also applied the diminution rule advocated by the defendant to cases where the injury was

solely to the land (*Richards v. Gundlach* (1924), 245 Ill. App. 264). The diminution rule, however, has not been universally applied, and in *First National Bank* the court noted that other jurisdictions have allowed an injured party to recover the reasonable cost of restoring the property to its approximate original condition. The court acknowledged that this appeared to be the more equitable rule.

■■ We believe that the criticisms which have been directed at an automatic application of the diminution rule are well founded. (See generally Dobbs, Handbook on the Law of Remedies §5.1 (1973).) The law of torts attempts primarily to restore the injured party to as good a position as he held prior to the tort. (Restatement (Second) of Torts §901 (1979).) In accomplishing that result, courts must be mindful of the fact that rules governing the proper measure of damages in a particular case are guides only and should not be applied in an arbitrary, formulaic, or inflexible manner, particularly where to do so would not do substantial justice. *Roark v. Musgrave* (1976), 41 Ill. App. 3d 1008, 355 N.E.2d 91.

When a landowner has shown that he has suffered a compensable injury, we believe it is necessary to examine the exact interest harmed before answering the question of what amount is necessary to fully compensate for that harm. Allowing a plaintiff to recover the lesser of the cost of repair or the diminution in market value may be appropriate where the interest which has been harmed is purely financial, as where the land was purchased as a business investment with an eye towards speculation or where it is held solely for the production of income. However, the same measure of damages may be painfully inadequate when the land is held for a personal use such as a family residence and the harm may be corrected with a reasonable expenditure even though the expenditure exceeds the amount the land has diminished in value. In the latter case, the full repair cost will come much closer to restoring what was actually lost and will not require the injured party to correct the harm with funds from his own pocket. Automatic application of the rule advocated by the defendant could, in many cases, force plaintiffs to sell their property to a defendant and, in effect, grant a private right of eminent domain. To grant such a right in cases such as the one at bench would inadequately protect plaintiffs' legitimate interest in the use and enjoyment of their property. The courts of this State have recently begun to recognize this fact as they have rejected application of the diminution rule in similar cases.

In *Arras v. Columbia Quarry Co.* (1977), 52 Ill. App. 3d 560, 367 N.E.2d 580, the defendant's blasting activities destroyed a well located on land where the plaintiffs had lived for almost 30 years. At the trial of that case, the only evidence which was presented on the issue of damages was expert testimony concerning the cost of drilling a new well. On appeal,

the defendant strenuously argued that the only relevant measure of damages was the diminution in the fair market value of the property. Our sister court disagreed and felt that the permanent/nonpermanent dichotomy which Indiana applied when ascertaining damages for an injury to realty was a logical and well reasoned approach. The rule which the court adopted requires a determination of whether the injury is permanent or nonpermanent. If permanent, the measure of damages is the market value of the realty before the injury less its market value after the injury. When the injury is nonpermanent, the measure of damages is the cost of restoring the property to its original condition. Similarly, in *Zosky v. Couri* (1979), 77 Ill. App. 3d 1033, 397 N.E.2d 170, the permanent/nonpermanent approach was applied where the injury consisted of tire ruts on the plaintiff's lawn.

■■ We agree with the approach adopted in *Arras* and *Zosky* and conclude that the plaintiffs in this case were entitled to recover the cost of repairing the damages. Here, as in those cases, the damage was to realty held for personal rather than a business use, the injury was capable of repair, and this repair could be accomplished without expending amounts wholly disproportionate to the value of the land. The trial court, accordingly, did not err in refusing defendant's tendered instruction.

## II

Defendant next challenges the trial court's ruling barring evidence that the State of Illinois requires releases from the owners of private property where this type of construction refuse is placed. Defendant argues that this evidence was relevant because no one with a 2.4 million dollar contract would risk nonpayment or delayed payment by improper disposal of the material, particularly when another dumping site was available, and transportation to this alternate site would have cost a mere $500 more than dumping on the plaintiffs' land.

■■ Defendant first attempted to introduce this evidence during the redirect examination of the on-site supervisor. Redirect examination is generally limited to an inquiry into new material elicited during cross-examination, and ordinarily it should not cover matters which could have been brought out during the direction examination. It is within the trial court's discretion to permit questions which touch upon new matter. (*City of Springfield v. Dalby* (1891), 139 Ill. 34, 29 N.E. 860.) The trial court here did not abuse its discretion when it rejected the proffered testimony. The evidence concerning the releases was of marginal relevance in determining whether the plaintiffs consented to the defendant's conduct, and the supervisor had previously testified that no releases were sought from these plaintiffs.

Defendant also claims the trial court erred when it did not allow the

defendant to present evidence as to whether it would have even considered delivering only two loads of concrete to the plaintiffs' property.

The evidence on this point is somewhat confusing because defendant argues in this court that it would not have delivered such a nominal amount to the plaintiffs. Defendant's own evidence belies this argument. At trial, the on-site supervisor testified that defendant's president instructed him to find out what Mrs. Myers wanted and give her the material. During defendant's offer of proof, the supervisor testified that if plaintiffs had only wanted two loads the supervisor would have told Mrs. Myers to meet the truck driver and show him where to place the concrete. He did testify that he would not have had time to go to the plaintiffs' property and inspect it if only two loads were to be delivered.

■■ This evidence falls far short of establishing that the defendant would have refused to deliver only two loads. In fact, it shows that the concrete would have been delivered but the supervisor would not have first inspected the plaintiffs' property. The evidence does not support defendant's contentions and its exclusion was not error. Even if the court had erred in excluding this evidence, the error would have been harmless because it would not have affected the result reached. (*Gillespie v. Norfolk & Western Ry. Co.* (1972), 3 Ill. App. 3d 779, 278 N.E.2d 420.) The jury obviously rejected the supervisor's testimony as to the amount of concrete that Mrs. Myers requested. We do not believe that this evidence would have affected that result.

### III

Finally, the defendant argues that the jury's verdict is against the manifest weight of the evidence because defendant's witnesses were more credible, and the plaintiffs' version was "preposterous." Defendant argues that the following factors show that its witnesses were more credible: (1) All of plaintiffs' witnesses were related to the plaintiffs; (2) one does not commit trespass on an employee's relative's property (plaintiffs' cousin worked for the defendant); (3) at the time of trial the supervisor was no longer employed or associated with the defendant and had no reason to give false testimony; (4) it would be "ridiculous" to dump this concrete on the plaintiffs' land when the savings to the defendant only totaled $500; and (5) plaintiffs could not have expected the defendant to sort through the broken concrete to remove rubble, dirt, and reinforcement material before delivering it to the plaintiffs.

■■ ■ We agree with defendant's assertion that this question is one of credibility. The jury was aware of the factors defendant cites as a basis for rejecting plaintiffs' testimony. The jury chose, however, to believe the plaintiffs, and where the testimony is contradictory—as it certainly

was here—the determination of credibility is for the jury, and its findings will not be disturbed unless they are contrary to the manifest weight of the evidence. (*Russo v. Checker Taxi Co.* (1978), 67 Ill. App. 3d 379, 385 N.E.2d 33.) The jury decided this question against the defendant and we will not meddle with that judgment.

Affirmed.

GREEN and WEBBER, JJ., concur.